## UNITED STATES v. SCHUTTE.

(District Court, D. North Dakota. June 13, 1918.)

1. STATUTES ⬅⬆241(1)—CONSTRUCTION—CRIMINAL STATUTES.

It is a cardinal rule that criminal statutes should be strictly construed.

2. WAR ⬅⬆4—OFFENSES—STATUTE.

Espionage Act, § 3, declaring that whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces, etc., does not apply to every disloyal utterance, but only to those affecting the military or naval forces, etc.

3. WAR ⬅⬆4—OFFENSES—VIOLATION OF ESPIONAGE ACT—INDICTMENT—"WILL-FULLY."

An indictment charging a·violation of Espionage Act, § 3, denouncing the offense of willfully making or conveying false reports with intent to interfere with the success of military operations, etc., must allege that the language was "willfully" uttered; that is, with intent to accomplish the forbidden purpose.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Willfully.]

4. WAR ⬅⬆4—VIOLATION OF ESPIONAGE ACT—INDICTMENT.

An indictment charging a violation of Espionage Act, § 3, denouncing the circulation of false reports, and statements with intent to interfere with the success of military operations, etc., must show that the language itself was of such a character as to cause the results denounced, and so the language should be set forth, or, if too obscene, should be described.

5. WAR ⬅⬆4—ESPIONAGE ACT—INDICTMENT.

An indictment charging a violation of Espionage Act, § 3, denouncing the circulation of false reports intended to interfere with the success of military operations, etc., should show that the language was uttered on such an occasion that a reasonable man could say it might produce one or more of the results denounced, although it is unnecessary to allege or prove that any particular person was induced by the language to commit acts of disloyalty.

6. WAR ⬅⬆4—ESPIONAGE ACT—JURY QUESTION.

In a prosecution for violating Espionage Act, § 3, denouncing the willful circulation of rumors with the intent to interfere with the success of military operations, etc., the question whether the language used had the effect denounced is one of fact for the jury.

7. WAR ⬅⬆4—ESPIONAGE ACT—VIOLATIONS.

In view of the amendment of May 16, 1918, to Espionage Act, § 3, denouncing the circulation of false reports tending to interfere with the success of military operations of the United States, etc., an indictment charging that accused willfully stated that "this is a rich man's war, and it is all a damn graft and swindle," but which did not allege the circumstances under which the language was uttered, is insufficient to charge an offense, not showing that the language was uttered under circumstances tending to interfere with the success of military operations, etc.

---

B. H. Schutte was indicted for violation of Espionage Act, § 3. On demurrer to the indictment. Demurrer sustained.

M. A. Hildreth, U. S. Atty., of Fargo, N. D..
D. T. Youker, of Ellendale, N. D., for defendant.

AMIDON, District Judge.   [1, 2] The indictment in this case charges a violation of section 3 of the Espionage Act of June 15, 1917 (chapter 30, 40 Stat. 217), which reads as follows:

"Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies, and whoever when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service of the United States, shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both."

On its face this statute is confined to a limited class, namely, the military and naval forces and persons subject to the recruiting and enlistment service. Who these persons are is defined by law. Language, to violate the statute, must directly and proximately affect one or more of the limited class mentioned, in the manner specified. To stretch this law so as to cover all disloyal utterances, regardless of whether they affect the military or naval forces, or the enlistment and recruiting service, would not only violate the cardinal rule that criminal statutes should be strictly construed, but would defy the limitations which the statute itself expresses with unmistakable clearness. Such a perversion of law would itself be a supreme act of disloyalty, though done for the avowed purpose of suppressing disloyalty.

A valid indictment under the act must embrace three facts:

[3] (1) The language must have been willfully uttered. That excludes what is spoken in the heat of passion, without deliberate purpose. The term "willfully," as construed by the courts, necessarily imports a deliberate purpose to accomplish one or more of the things forbidden by law. St. Joseph Stockyards Co. v. United States, 187 Fed. 104, 110 C. C. A. 432; United States v. Sioux City Stockyards Co. (C. C.) 162 Fed. 556, 562; Felton v. United States, 96 U. S. 702, 24 L. Ed. 875; Potter v. United States, 155 U. S. 438, 15 Sup. Ct. 144, 39 L. Ed. 214.

[4] (2) The language itself must have been of a character to cause some of the results denounced by the law. It should be set forth in the indictment, or, if too obscene for a judicial record, it should be described so that the court can determine whether it possesses the forbidden quality.

[5, 6] (3) The language must have been uttered on an occasion such that a reasonable mind could say that it might produce one or more of the results mentioned in the act. By this I do not mean that the government must prove that some particular person was induced by the language to commit acts of disloyalty in the military or naval

forces, or fail to perform some step in the enlistment or recruiting service. All that is necessary is to show that the language was of such a character and was spoken within the hearing of one or more persons belonging to one of the classes specified in the act, so that a reasonable person might infer that it could produce one of the forbidden results. It will then become a question of fact for the jury to say whether in truth it did produce that result.

[7] The present indictment contains three counts, based respectively upon each of the three clauses of the statute. After stating the date and venue, the second count charges the offense as follows:

"That at said time and place the said defendant B. H. Schutte did willfully cause and attempt to cause insubordination, disloyalty, mutiny, and refusal of duty in the military and naval forces of the United States, to the injury of the service of the United States (the same being then and there as now a time of war between the United States of America and the Imperial German government), by willfully stating to divers persons whose true names are to the grand jurors unknown that 'this is a rich man's war and it is all a damn graft and swindle,' stating, 'if you do not believe it, just look at the cost of wheat.'"

The language attributed to defendant is offensively unpatriotic and is charged to have been willfully uttered. The first two requirements of a valid indictment are therefore clearly alleged. The pleading fails, however, to set forth in any manner the circumstances under which the language was used. So far as the indictment discloses, it may have been spoken to persons who have and could have no relationship to the military or naval forces, or the recruiting and enlistment service of the United States. If it were spoken under such circumstances, it would not be a violation of the statute. Suppose the language had been spoken to men all of whom were past 40 years of age, or to a woman's club; would any one claim that the purpose of the speaker was to produce the results forbidden by the statute? It is elementary criminal law that when language does not constitute a crime if uttered under some circumstances, and does constitute a crime if uttered under other circumstances, it is incumbent upon the government to specify in the indictment the circumstances under which it was uttered sufficiently to show that its utterance would probably produce the forbidden result. This cannot be left to speculation or inference, but must be clearly and directly charged. The circumstances are an element of the crime. It is not enough to charge that the language was uttered with intent to violate the law. That would be a mere legal conclusion, when proper pleading requires a statement of facts. The question is not for the pleader, but for the court, and the facts must be set forth, so that the court can say whether or not they constitute the crime. United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516; United States v. Cruikshank, 92 U. S. 542, 23 L. Ed. 588; United States v. Carll, 105 U. S. 613, 26 L. Ed. 1135; Armour Packing Co. v. U. S., 153 Fed. 1, 16, 82 C. C. A. 135, 14 L. R. A. (N. S.) 400; United States v. Kessel (D. C.) 62 Fed. 59; Floren v. United States, 186 Fed. 961, 108 C. C. A. 577; Knauer v. United States, 237 Fed. 8, 150 C. C. A. 210.

The statute deals only with a willful purpose to cause the results which it forbids. It is indispensable to the crime that facts be charged

and proven which reasonably lead to the inference that such was the purpose of the defendant. Remote and secondary results, not intended by the defendant, arising from a fair and truthful discussion of matters of public concern, do not fall within the purview of the act.

Congress has not left its purpose to be ascertained solely by a judicial interpretation of the act of June 15, 1917. It has interpreted the act itself. By the statute recently passed and approved May 16, 1918, (chapter 75), it expressly makes the mere utterance of disloyal language on certain subjects a crime. If such utterances were already forbidden by the act of June 15, 1917, why the amendment? The recent statute repeats all of the first act as quoted at the beginning of this opinion, and then adds the following new provisions:

"Whoever, when the United States is at war, * * * shall willfully utter, print, write, or publish any disloyal, profane, scurrilous, or abusive language about the form of government of the United States, or the Constitution of the United States, or the military or naval forces of the United States, or the flag of the United States, or the uniform of the Army or Navy of the United States, or any language intended to bring the form of government of the United States, or the Constitution of the United States, or the military or naval forces of the United States, or the flag of the United States, or the uniform of the Army or Navy of the United States into contempt, scorn, contumely, or disrepute, or shall willfully utter, print, write or publish any language intended to incite, provoke, or encourage resistance to the United States, or to promote the cause of its enemies, or shall willfully display the flag of any foreign enemy, or shall willfully by utterance, writing, printing, publication, or language spoken, urge, incite, or advocate any curtailment of production in this country of any thing or things, product or products, necessary or essential to the prosecution of the war in which the United States may be engaged, with intent by such curtailment to cripple or hinder the United States in the prosecution of the war, and whoever shall willfully advocate, teach, defend or suggest the doing of any of the acts or things in this section enumerated, and whoever shall by word or act support or favor the cause of any country with which the United States is at war or by word or act oppose the cause of the United States therein, shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both: Provided, that any employé or official of the United States government who commits any disloyal act or utters any unpatriotic or disloyal language, or who, in any abusive and violent manner criticizes the Army or Navy or the flag of the United States, shall be at once dismissed from the service. Any such employé shall be dismissed by the head of the department in which the employé may be engaged, and any such official shall be dismissed by the authority having power to appoint a successor to the dismissed official."

This amendment, so soon after the passage of the former act, is a clear legislative interpretation that the mere use of language, unpatriotic though it may be, is not in and of itself a crime under the act of June 15, 1917, unless it is spoken to or in the hearing of some person specified in the act.

The Supreme Court of Minnesota has recently had this whole subject under examination in construing a statute of that state which is much more comprehensive than the federal law under which the present indictment is framed. The case referred to is State v. Spartz, 167 N. W. 547, decided May 17, 1918, but not yet officially reported. There the indictment charged the defendant in the following language:

"The said Jake Spartz, at Dundas in the county of Rice and state of Minnesota, did speak and use the following language to the witnesses hereinafter named and to others: 'Louis Seimers was wounded and should be dead long ago.' That at said time the said Louis Seimers was a soldier in the army or navy of the United States government and was wounded while so engaged as such soldier in assisting the United States government in prosecuting the present war against Germany. That it was intended to express contempt by such language for the soldiers of the government of the United States, and to thereby discourage others from giving their full and unqualified support to said government in carrying on and prosecuting the present war."

The sections of the state law (chapter 463, Laws of 1917 [Gen. St. Supp. 1917, §§ 8521—1 to 8521—6]), under which the indictment was framed, reads as follows:

Section 2: "It shall be unlawful for any person in any public place, or at any meeting where more than five persons are assembled to advocate or teach by word of mouth, or otherwise, that men should not enlist in the military or naval forces of the United States or the state of Minnesota."

Section 3: "It shall be unlawful for any person to teach or advocate by any written or printed matter whatsoever, or by oral speech, that the citizens of this state should not aid or assist the United States in prosecuting or carrying on war with the public enemies of the United States."

A demurrer was interposed to the indictment and overruled by the trial court. This ruling was brought before the Supreme Court and reversed. The court sets forth the reasons for its decision in the following instructive language:

"It will be noticed that the gravamen of the offense under each section of the law is the teaching or advocating that men should not enlist, or that citizens should not aid. That would seem to show that the Legislature did not attempt by this act to punish every idle casual remark, wicked though it be, but only those utterances which on their face show a purpose to teach or advocate what the statute forbids, or which are made under such circumstances that it would be permissible for a jury to find a like purpose. The so-called innuendoes, and recitals in this indictment do not tend to show that the words uttered might be interpreted by the jury as teaching or advocating that citizens should not aid the government in the prosecution of the war; * * * nor are there any averments of accompanying circumstances showing that the spoken words were intended to advocate or teach, or could be understood by the hearers as advocating or teaching that citizens should not render such aid or assistance in the prosecution of the war as the government requires or has indicated as proper."

This decision is quite in harmony with the long-established principles of the Circuit Court of Appeals of this circuit, and of the Supreme Court of the United States, as will be seen from the cases above cited.

The uniform practice in framing indictments under the act of June 15, 1917, has been to charge that the seditious language was either spoken personally to men belonging to one of the classes mentioned in the act, whose names are given, or that it was spoken to a public audience composed in part of such men. The Attorney General has printed in leaflets all charges to juries and opinions of courts in cases arising under the act since its passage. So far as these disclose, the practice has been as I have just indicated. As the indictment in the present

case fails wholly to state that the language complained of was spoken to named persons belonging to one of the classes mentioned in the act, or to an audience at which such persons were present, it is fatally de·fective, and the demurrer must be sustained.

The grand jury that found the indictment is still in session. If the facts justify indicting the defendant under the law as explained in this opinion, a new indictment can be returned without serious trouble. Such a course is much better than to go to the expense of a trial, and then, if a conviction is obtained, have it set aside on appeal because of a mere defect of pleading.

Let an order be entered sustaining the demurrer.

&#9758;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes